For all of these reasons, I respectfully dissent.

CHEMICAL MANUFACTURERS ASSOCIATION, American Cyanamid Company, Allied Chemical Corporation, Stauffer Chemical Company, and Union Carbide Corporation, Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

EDISON ELECTRIC INSTITUTE, et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

AMERICAN MINING CONGRESS, et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

MINING AND RECLAMATION COUNCIL OF AMERICA, INC., Petitioner,

v.

Douglas M. COSTLE, Administrator of the United States Environmental Protection Agency, Respondent.

AMERICAN PETROLEUM INSTITUTE, et al., Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Douglas M. Costle, Administrator, United States Environmental Protection Agency, Respondents.

AMERICAN PAPER INSTITUTE and National Forest Products Association, Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Nos. 79–2299, 79–2452, 79–2455, 79–2476, 79–2477 and 79–2481.

United States Court of Appeals, District of Columbia Circuit.

Submitted Without Oral Argument.

Decided 16 March 1982.

Frank H. Morison, John D. Fognani, Elizabeth Sharrer, Denver, Colo., R. Brooke Jackson, James R. Walpole and John D. Austin, Jr., Washington, D. C., were on the

brief for American Mining Congress, et al., petitioners in No. 79–2455.

Alan B. Mollohan, J. Roy Spradley, Jr., Washington, D. C., Lawrence A. Demase, Edward S. Shipper, Jr., Pittsburgh, Pa., and R. Stuart Broom, Washington, D. C., were on the brief for Mining and Reclamation Council of America, Inc., petitioner in No. 79–2476.

Theodore L. Garrett and John T. Smith, II, Washington, D. C., entered appearances for Chemical Manufacturers Ass'n, et al., petitioners in No. 79–2299.

Thomas H. Truitt, Charles C. Abeles and William R. Weissman, Washington, D. C., entered appearances for Edison Institute, et al., petitioners in No. 79–2452.

John Quarles and Michael W. Steinberg, Washington, D. C., entered appearances for American Petroleum Institute, et al., petitioners in No. 79–2477.

Michael K. Glenn, Washington, D. C., entered an appearance for American Paper Institute, et al., petitioners in No. 79–2481.

Anthony Z. Roisman, Lee R. Tyner, Dept. of Justice, Mark A. Greenwood and Charles G. Field, Environmental Protection Agency, Washington, D. C., were on the brief for respondent.

Before ROBINSON, Chief Judge, WILKEY and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

On 13 September 1979 the Environmental Protection Agency (EPA) issued its final Criteria for Classification of Solid Waste Disposal Facilities and Practices,[1] pursuant to sections 1008(a)(3) and 4004(a) of the Resource Conservation and Recovery Act of 1976 (RCRA).[2] At issue in this case is the inclusion of mining waste in the category of solid waste regulated by the Criteria. Petitioners American Mining Congress (AMC) and Mining and Reclamation Council (MARC) contend that EPA lacked authority to regulate mining waste, at least at this time, and that in any event it acted arbitrarily and capriciously in doing so. We reject these contentions and uphold the agency's action.

## I. BACKGROUND

### A. *Statutory Scheme*

RCRA amended the Solid Waste Disposal Act of 1965[3] in an attempt to deal comprehensively with the problem of solid waste disposal. RCRA provides for direct federal regulation of hazardous waste, but leaves to the states regulation of nonhazardous waste such as the mining waste at issue here. Any state that wishes to receive federal financial assistance in developing a waste management program must submit plans that comply with federal guidelines established by EPA.[4]

For our purposes here, the key point about RCRA is that "open dumps"—"any facility or site where solid waste is disposed of which is not a sanitary landfill . . . and which is not a facility for disposal of hazardous waste"[5]—are prohibited. State plans must prohibit open dumping and provide a schedule for upgrading of existing open dumps.[6] EPA has two responsibilities in this regard. First, EPA is required under section 1008(a)(3) to establish criteria defining "those solid waste management

---

1. 44 Fed.Reg. 53,438 (13 Sept. 1979) (codified at 40 C.F.R. Part 257 (1981)).

2. 42 U.S.C. § 6907(a)(3) (Supp. III 1979) (as amended); *id.* § 6944(a) (1976).

3. Pub.L.No.89–272, 79 Stat. 997, *as amended by* Resource Recovery Act of 1970, Pub.L.No. 91–512, 84 Stat. 1227 (formerly codified at 42 U.S.C. §§ 3251–3259 (1970)). The Act was further amended by the Quiet Communities Act of 1978, Pub.L.No.95–609, § 7, 92 Stat. 3079, 3081; the Used Oil Recycling Act of 1980, Pub.

L.No.96–463, 94 Stat. 2055; and the Solid Waste Disposal Act Amendments of 1980, Pub. L.No.96–482, 94 Stat. 2334.

4. 42 U.S.C.A. § 6943 (West Supp.1981) (as amended).

5. *Id.* § 6903(14) (as amended).

6. *Id.* §§ 6943(a)(3), 6945(a) (as amended); 42 U.S.C. § 6944(b) (1976).

practices which constitute ... open dumping."[7] Second, the EPA guidelines must include classification of disposal sites as either sanitary landfills or open dumps. Section 4004(a) provides that these criteria "shall provide that a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility."[8]

EPA was required to issue its criteria under sections 1008(a)(3) and 4004(a) by 21 October 1977, one year after RCRA was enacted.[9] Within one year after these criteria were issued, EPA was required to publish an inventory of all open dumps in the nation.[10]

One other relevant portion of RCRA is section 8002(f), which provides that EPA "shall conduct a detailed and comprehensive study on the adverse effects of solid wastes from active and abandoned surface and underground mines on the environment ...."[11] This study, one of several special studies required under the statute, was due by 1 October 1978.[12]

Also relevant to this case is the Surface Mining Control and Reclamation Act of 1977 (SMCRA).[13] Unlike RCRA, SMCRA is administered by the Secretary of Interior. This statute establishes binding federal standards for conducting all phases of surface coal mining. Any surface coal mining operator must obtain a permit, issued pursuant either to an approved state program or a federal program, prior to conducting operations.[14] The permit requires adherence to SMCRA environmental protection performance standards, as elaborated by the Secretary of Interior, including standards for disposal of mining waste.[15]

## B. EPA's Rulemaking Proceeding

EPA decided to issue one set of regulations to fulfill its duty to define the adverse effects of solid waste disposal under both section 1008(a)(3) and section 4004(a).[16] The final Criteria issued on 13 September 1979, almost a year after the statutory deadline.[17] The Criteria were challenged by a host of parties, but most issues were resolved by a Partial Settlement Agreement entered in this court on 28 October 1980. Not resolved were the two mining issues before us today: (1) whether EPA had authority to subject mining waste to regulation, and (2) whether EPA was permitted to regulate mining waste prior to completion of the section 8002(f) mining waste study.[18]

We hold that the Criteria as applied to mining waste were lawfully promulgated by EPA pursuant to its statutory authority, and affirm on all issues.

---

**7.** 42 U.S.C. § 6907(a)(3) (Supp. III 1979) (as amended).

**8.** *Id.* § 6944(a) (1976).

**9.** *Id.* § 6907(a)(3) (Supp. III 1979) (as amended); *id.* § 6944(a) (1976).

**10.** 42 U.S.C.A. § 6945(b) (West Supp.1981) (as amended).

**11.** *Id.* § 6982(f) (as amended).

**12.** 42 U.S.C. § 6982(*l*) (1976). This was amended in 1980 to provide that the study be completed within three years after 21 October 1980. 42 U.S.C.A. § 6982(f) (West Supp.1981).

**13.** Pub.L.No.95–87, 91 Stat. 445 (codified at 30 U.S.C. §§ 1201–1328 (Supp. III 1979)).

**14.** 30 U.S.C. § 1256(a) (Supp. III 1979).

**15.** *Id.* § 1265.

**16.** The Criteria also serve as guidelines on disposal and use of sewage sludge, fulfilling EPA's responsibility under § 405(d) of the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. § 1345(d) (Supp. III 1979). This part of the Criteria is not at issue here.

**17.** A challenge to EPA's tardiness was resolved in the district court, which established a timetable for promulgation of the guidelines. *Illinois v. Costle*, No. 78–1899 (D.D.C. 3 Jan. 1979), *reprinted in* 12 Env't Rep.Cas. (BNA) 1597 (1979).

**18.** A third mining issue—concerning EPA's decision not to regulate overburden from mining operations which is intended for return to the mine site—was also preserved, but is not now before the court.

## II. ANALYSIS

### A. *EPA Authority to Regulate Mining Waste under RCRA*

Section 1004(27) of RCRA defines "solid waste" as including "discarded material . . . resulting from . . . mining . . . operations." [19] This definition is used later in defining an "open dump" as "any facility or site where solid waste is disposed of" which is not a sanitary landfill or a hazardous waste disposal site. [20] Without question, then, the statutory language includes mining waste disposal within the scope of EPA's obligation to define the practices that constitute open dumping and to classify disposal sites as open dumps or sanitary landfills. Nonetheless, petitioner MARC contends that EPA lacks authority to regulate mining waste because RCRA's legislative history clearly indicates that mining waste was exempted from the scope of sections 1008(a)(3) and 4004(a). We disagree.

We begin by noting our limited standard of review. An agency's interpretation of its governing statute is entitled to substantial deference. "To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." [21]

EPA's interpretation of RCRA in this case is eminently reasonable. It has followed the statutory language. Petitioner cites cases where a statute's "plain mean-

ing" was overcome by convincing evidence in the legislative history that a different meaning was intended. Here, however, petitioner seeks not to give the definition in section 1004(27) an unusual meaning, but rather to read "mining" out of the definition entirely. Yet petitioner has not suggested that the word was inserted by mistake, [22] nor has it argued that inclusion of the word results in a policy so absurd that we cannot attribute its enactment to the Congress. [23] In short, petitioner has not offered any reasonable explanation, much less the compelling one necessary for overriding the agency's construction, for including "mining" within "solid waste" generally while simultaneously excluding "mining" from "solid waste" for purposes of regulating open dumps—the critical component of RCRA's regulation of nonhazardous waste.

Petitioner relies primarily on an exchange on the Senate floor between Senator Domenici and Senator Randolph, sponsor of the Senate bill. In response to questions by Senator Domenici about the bill's regulation of mining, Senator Randolph stated: "This bill definitely is directed at the disposal of municipal and industrial wastes. . . . There is nothing in this bill to regulate mining. . . . The measure would not affect surface mining activities. Reclamation is not solid waste disposal." [24]

These statements indicate some belief that mining waste was not covered by the bill, but they are not conclusive [25] nor even persuasive. Senator Randolph acknowl-

---

**19.** 42 U.S.C. § 6903(27) (1976).

**20.** 42 U.S.C.A. § 6903(14) (West Supp. 1981) (formerly codified at 42 U.S.C. § 6945(a) (1976)).

**21.** *FEC v. Democratic Senatorial Campaign Comm.,* —- U.S. ——, ——, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).

**22.** The Senate Report stated: "The term 'solid waste' in existing law is *expanded specifically to include* sludge from water or waste treatment plants or air pollution control facilities, liquid, semisolid or contained gaseous materials, and *wastes from mining activities.*" S.Rep. No. 988, 94th Cong., 2d Sess. 25 (1976) (emphasis added).

**23.** As EPA observes, the House Report contains specific examples of potentially harmful disposal of hazardous mining waste. *See* H.R. Rep. No. 1491, 94th Cong., 2d Sess. 17, 19 (1976) U.S.Code Cong. & Admin.News 1976, p. 6238. *See also id.* at 4, 15 (expressing concern that mining waste may be harmful).

**24.** 122 Cong.Rec. 21,424–25 (1976) (remarks of Sen. Randolph).

**25.** "The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979).

edged that "mining" was within the new definition of "solid waste," [26] yet he offered no explanation for the existence of this language if in fact the bill did not cover mining waste. If he thought the definition erroneous or ill-advised, he might have said so and attempted to have it altered. He did neither, and indeed later went on to discuss *when* EPA would issue regulations covering mining waste practices [27]—a strange point of discussion if EPA had no authority over mining waste at all.

In sum, Senator Randolph's statements on the status of mining waste under the bill are ambiguous and contradictory. More important, even if he had expressed a consistent understanding that mining waste could not be regulated under the bill, this would not be sufficient to overcome EPA's reliance on the unequivocal statutory language. EPA's conclusion that RCRA empowers it to include mining waste in its classification of solid waste disposal sites is reasonable, and we therefore uphold it.

## B. *Relation of SMCRA to RCRA*

 Petitioner MARC's central contention is that SMCRA should "be given precedence over" RCRA.[28] MARC says that this is not an argument of implied repeal— an argument that rarely succeeds—but rather one that a more specific statute (allegedly, SMCRA) should be deemed an exception to a more general one (allegedly, RCRA). In this case this argument is

groundless. When forced to choose which of two contradictory statutes to enforce, courts may decide that the more specific statute is an exception to the more general one.[29] But if the statutes do not contradict one another no choice need be made. And it is clear that the relevant portions of RCRA and SMCRA do not conflict. At most, the two statutes may result in promulgation of two sets of guidelines on disposal of mining waste.[30] Such regulatory overlap is not the same as a situation where two statutes provide mutually exclusive results when applied to the same facts, especially since SMCRA and RCRA are directed toward quite different objectives: SMCRA directly regulates surface coal mining, while RCRA provides guidelines for state regulation of open dumping.

Petitioner MARC apparently concedes that the two statutes are not in conflict, but it argues that provisions in each statute which instruct EPA not to duplicate regulation provided by other agencies demonstrate that Congress intended SMCRA to operate as an exception to RCRA. We reject this argument. Provisions such as SMCRA section 702(c), which provides that "To the greatest extent practicable each Federal agency shall cooperate with the Secretary and the States in carrying out the provisions of this chapter," [31] cannot be interpreted as eliminating any statutory power of any agency.[32] Accepting this argu-

---

**26.** 122 Cong.Rec. 21,424 (1976) (remarks of Sen. Randolph) ("Yes, that is the definition in the bill.")

**27.** *See id.* at 21,425 (discussion between Sen. Domenici and Sen. Randolph over when "EPA will get around to agriculture and mining").

**28.** Brief for Petitioner MARC at 36.

**29.** *See, e.g., Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976); *Preiser v. Rodriguez,* 411 U.S. 475, 489–90, 93 S.Ct. 1827, 1836–37, 36 L.Ed.2d 439 (1973).

**30.** MARC itself argues only that the guidelines issued pursuant to SMCRA are "functionally equivalent to the EPA solid waste criteria." Brief for Petitioner MARC at 30.

**31.** 30 U.S.C. § 1292(c) (Supp. III 1979). MARC conveniently fails to cite RCRA § 6003, 42 U.S.C. § 6963 (1976), which required all federal agencies to cooperate with EPA. This has since been modified to a requirement to "assist" EPA. 42 U.S.C.A. § 6963(a) (West Supp. 1981).

**32.** MARC also cites RCRA § 1006(b), 42 U.S.C. § 6905(b) (Supp. III 1979); SMCRA § 308(b), 30 U.S.C. § 1228(b) (Supp. III 1979); SMCRA § 413, 30 U.S.C. § 1243 (Supp. III 1979); SMCRA § 503(a)(6), 30 U.S.C. § 1253(a)(6) (Supp. III 1979); and SMCRA § 713(a), 30 U.S.C. § 1303(a) (Supp. III 1979). It is absolutely clear that none of these provisions even remotely suggest that an agency's statutory authorization can be eliminated by a judicial decree that the authorization duplicates that of another agency.

ment would, contrary to petitioner's contention, amount to finding a repeal by implication. Nothing in SMCRA provides for repeal of EPA's authority over mining waste,[33] and we hold that SMCRA had no effect on RCRA's authorization.[34]

## C. *The Mining Waste Study*

■ Petitioner AMC concedes that RCRA gives EPA authority to regulate mining waste, but it contends that this authority may not be exercised until the section 8002(f) mining waste study is completed. Nothing in the statute mandates this result. Nonetheless, AMC argues that a study to determine the adverse effects of mining waste is made meaningless if mining waste is regulated before completion of the study. We think not. We hold that EPA was authorized to include mining waste in the Criteria issued in 1979.

Our review of this issue is again limited to determining whether EPA's interpretation of the statute is reasonable; it is quite reasonable. Nothing in RCRA conditions exercise of regulatory power over mining waste on completion of the mining waste study. Nor is there any clear evidence that the study was meant solely or even predominantly for use in promulgating regulations under sections 1008(a)(3) and 4004(a). On the contrary, the study seems broadly conceived for the purpose of providing infor-

mation for future use: section 8002(f) provides that EPA "shall publish a report of such study and shall include appropriate findings and recommendations for Federal and non-Federal actions concerning such effects." [35] EPA remains free to alter its Criteria, if necessary, in accordance with the results of the study.

In addition, sections 1008(a)(3) and 4004(a) and section 8002(f) have statutory deadlines which demonstrate their independent operation. The section 1008(a)(3) and section 4004(a) criteria were due one year after RCRA was enacted, and section 4005(b) required publication of an inventory of open dumps one year after that. Section 8002(f) was supposed to be completed in two years as well.[36] It is difficult to argue, therefore, that Congress intended the study to precede regulation of mining waste under sections 1008(a)(3) and 4004(a).

Against these arguments petitioner cites legislative history indicating a congressional awareness that information about the environmental dangers of mining waste was lacking and that it might be wise to attack first the well-known problems of municipal and industrial disposal practices.[37] Petitioner fails to mention the other portions of the legislative history indicating a concern that environmental problems of mining waste may indeed be severe.[38] But the central problem is that petitioner's argu-

---

**33.** Congress knows how to repeal such authority unambiguously. In 1980 EPA authority over *hazardous* mining waste was transferred entirely to the Secretary of Interior. *See* 42 U.S.C.A. § 6905(c)(2) (West Supp.1981). EPA authority over *nonhazardous* mining waste was not altered.

**34.** EPA argues that section 702(a) of SMCRA specifically leaves RCRA unaffected: "Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing ... (5) The Solid Waste Disposal Act." 30 U.S.C. § 1292(a) (Supp. III 1979). Petitioner points out, however, that whereas other listed statutes were followed by the phrase "as amended," this one was not. RCRA, as an amendment to the Solid Waste Disposal Act, might thus be excluded. Because of this issue, we do not rely on this section. We note, however, that it would take a direct statement for SMCRA to repeal RCRA's mining waste authorization, not

merely a failure to include the words "as amended."

**35.** 42 U.S.C.A. § 6982(f) (West Supp.1981) (as amended).

**36.** *See* p. 510 & notes 9–12 *supra.*

**37.** *See* H.R.Rep.No.1491, 94th Cong., 2d Sess. 15 (1976) U.S.Code Cong. & Admin.News 1976, p. 6253 ("Committee information on the potential danger posed by mining waste is not sufficient to form the basis for legislative action at this time."); S.Rep.No.988, 94th Cong., 2d Sess. 14 (1976) ("In drafting the criteria ..., the Administrator should address [municipal and industrial] disposal before addressing agricultural or mining waste management practices.").

**38.** *See* note 23 *supra.* That Congress enacted SMCRA one year after RCRA casts further doubt on petitioner's argument that Congress

ment fails to overcome the reasonableness of EPA's reliance on the plain language of the statute, which does not condition EPA's authority on completion of the study. Once again, we refuse to add or subtract language from RCRA simply to conform to certain vague portions of the legislative history. We uphold EPA's decision to regulate mining waste prior to completion of the section 8002(f) study.

### D. The "Arbitrary and Capricious" Standard

█ Petitioner AMC's final claim is that EPA acted arbitrarily and capriciously in applying the Criteria to mining waste. It argues that since EPA excluded other categories of waste based on the legislative history, it should have done the same here;[39] that EPA erroneously failed to consider two studies on mining waste which suggest that further information is necessary before proceeding;[40] that EPA ignored the unique characteristics of mining which may make the regulations onerous; and that EPA had inadequate data for proceeding since it relied on studies which did not deal specifically with mining waste.

These contentions are meritless. That EPA made other exclusions is irrelevant. Those cases are not before us now, and each will have to be judged on its own merits. EPA quite reasonably followed the statutory definition of "solid waste" when it included mining waste under the Criteria. We are satisfied that EPA conducted a sufficient examination of the available evidence in determining to follow this statutory mandate. If the two preliminary studies or the final section 8002(f) study provide information suggesting that EPA should alter its Criteria with regard to mining waste, petitioners may ask EPA to do so.

The same is true of the alleged unique characteristics of the mining industry. If certain regulations prove excessively burdensome, petitioner may ask EPA to change them. We will not find, however, based on speculative allegations, that EPA has acted arbitrarily or capriciously in subjecting mining waste to regulation under a statute whose language specifically contemplates such regulation.[41]

### III. CONCLUSION

EPA has acted in strict accordance with RCRA. Petitioners have attempted to turn a few passages in the legislative history that are partially contrary to the statutory language into a justification for this court to rewrite the statute. We cannot do so.

*Affirmed.*

---

did not want any regulation of mining waste until a comprehensive study was completed.

**39.** For a list of exceptions, see 40 C.F.R. § 257.1(c) (1981).

**40.** These studies were commissioned by EPA as part of the section 8002(f) study. *See* 44. Fed. Reg. 13,574 (12 Mar. 1979); *id.* at 18,551 (28 Mar. 1979).

**41.** We reject petitioner MARC's charges that the Criteria are invalid because EPA failed to send its proposed guidelines to certain congressional committees as required by RCRA § 1008(b), 42 U.S.C. § 6907(b) (Supp. III 1979) (as amended). This allegation is based solely on EPA's "failure" to state in the Criteria that it had complied with section 1008(b). It is clear from the record, however, that EPA did notify the committees. EPA is not obligated to state or prove this in its regulations.