**CSX TRANSPORTATION, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Potomac Electric Power Company, Intervenor.**

**No. 87–1646.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1988.

Decided Feb. 17, 1989.

As Amended Feb. 17, 1989.

G. Paul Moates, with whom Richard E. Young, Washington, D.C., and Charles C. Rettberg, Jr., Cleveland, Ohio, were on the brief, for petitioner.

Thomas J. Stilling, Atty., I.C.C., with whom Ellen D. Hanson, Associate Gen. Counsel, I.C.C., and John J. Powers III, and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

C. Michael Loftus, John H. LeSeur, and Frank J. Pergolizzi were on the brief for intervenor. William T. Torgerson, Washington, D.C., also entered an appearance for intervenor.

Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

BUCKLEY, Circuit Judge:

CSX Transportation seeks review of an Interstate Commerce Commission decision ordering it to refund to Potomac Electric Power Company all amounts attributable to a 1981 rate increase taken by the petitioner pursuant to a section added to the Interstate Commerce Act by the Staggers Rail Act of 1980. That section permits a rail carrier, within limits, to increase unilaterally "any rate over which the Commission has jurisdiction." The ICC held, however, that the profit-enhancing increase permitted under the Staggers Act did not apply to a rate previously prescribed by the Commission as the carrier's maximum reasonable rate. Because a prescribed rate is beyond question a rate within the Commission's jurisdiction, we conclude that Congress intended the rate increase authorized by the Staggers Act to apply to previously prescribed rates. Accordingly, we reverse.

## I. BACKGROUND

### A. Statutory Background

The Interstate Commerce Act ("Act"), 49 U.S.C. §§ 10701 et seq. (1982), was originally enacted to protect the public against the abuse of monopoly power at a time when railroads dominated interstate transportation in the United States. To this end, it granted the Interstate Commerce Commission ("ICC" or "Commission") discretionary power to investigate the reasonableness of rates proposed by rail carriers. Id. §§ 10707 and 11701(a). The Act also permitted a shipper to file a complaint challenging a proposed rate. Id. § 11701(b). When it found a carrier's rate to be unreasonable, the Commission had the authority to order the carrier to pay the shipper damages for overcharges. Id. § 11705(b)(2) and (c). The ICC was also authorized to prescribe a maximum future rate, in which case "the affected carrier may not publish, charge, or collect a different rate." Id. § 10704(a)(1).

In 1980, Congress enacted the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 ("Staggers Act"), which was designed to eliminate unnecessary or inefficient rate regulation, 94 Stat. at 1896, and to bolster the financial stability of the railroads, id. at 1897. The Staggers Act did so, in part, by adding a new section to the ICA, 49 U.S.C. § 10707a, that permitted carriers to put certain rate increases into effect without prior Commission approval.

Section 10707a authorizes carriers to initiate two types of rate increases. First, carriers may raise their rates to meet rising costs, with the amount of the increase to be determined by reference to an industry-wide "rail cost adjustment factor" ("RCAF"). Id. § 10707a(a) and (b). Second, to enhance its profits, a carrier may "increase any rate over which the Commission has jurisdiction" within a statutorily specified "zone of rate flexibility" ("ZORF"). Id. § 10707a(c)(1) and (d)(1).

The resulting rates may not exceed the "adjusted base rate" (i.e., base rate multiplied by RCAF, *id.* § 10707a(a)(2)(A)) plus any increase allowed under either section 10707a(c)(1) (up to six percent per year from 1980 through 1984) or section 10707a(d) (up to four percent per year after 1984).

In this case, we must resolve a statutory conflict between section 10704(a)(1), which prohibits a rail carrier from increasing an ICC-prescribed maximum rate, and the more recently adopted section 10707a(c), which allows a carrier to take a ZORF increase on "any rate" without prior regulatory clearance.

## B. ICC Proceedings

In *Potomac Electric Power Co. ("PEPCO") v. Penn Central Transp. Co.*, 356 I.C.C. 815 (1977), the ICC ruled that the predecessors-in-interest of petitioner CSX Transportation ("CSXT") were charging unreasonable rates for transporting trainloads of coal to intervenor PEPCO's generating station in Dickerson, Maryland. Subsequently, the ICC prescribed a maximum reasonable rate of $3.87 per ton. *PEPCO v. Penn Central*, 359 I.C.C. 222, 240 (1977). On a petition for reopening, the ICC affirmed the rate prescription, *PEPCO v. Penn Central*, 358 I.C.C. 473 (1978), which was upheld in *B & O R.R. Co. v. United States*, 594 F.2d 856 (4th Cir.) (unpublished decision issued Apr. 2, 1979).

On September 15, 1981, CSXT took a three percent ZORF profit-enhancing increase, which PEPCO has contested in two separate administrative proceedings. In the challenge at issue here, PEPCO argued that as the ICC's 1977 prescription order established the carrier's maximum permissible profit level, CSXT had violated section 10704(a)(1) by unilaterally increasing its rate. CSXT maintained that section 10707a(c) authorized shippers to take ZORF increases in prescribed rates without the Commission's prior approval.

The ICC issued its decision on October 19, 1987. *Potomac Electric Power Co. v. Consolidated Rail Corp.*, Nos. 36114 and 36114 (Sub No. 1) (unpublished) ("ICC Decision"). At the outset of its discussion, the Commission conceded that in two earlier decisions it had indirectly indicated that CSXT could take increases on prescribed rates. Nevertheless, while it acknowledged the "apparent conflict" between sections 10707a and 10704(a)(1), the Commission offered an interpretation "which can harmonize both language and intent," thereby avoiding a finding of "irreconcilable conflict" that would dictate a holding that the newer provision (§ 10707a) partially repealed the older one (§ 10704(a)(1)).

In the Commission's view, section 10704(a)(1)'s maximum rate prescription was intended to allow carriers to cover costs and to earn a reasonable return, but to prevent them from extracting unreasonable profits. Thus, any attempted increase above the prescribed maximum rate was presumptively unreasonable, and allowing a carrier to take such an increase by invoking section 10707a would force a shipper to relitigate a rate case that the shipper had already won. Turning to the Staggers Act, the Commission explained that section 10707a promoted two distinct goals: to facilitate cost recovery in a period of high inflation, and to permit the wider profit margins that Congress believed to be required in order to restore the nation's railroads to economic health. To accomplish the first goal, Congress provided carriers with an automatic right to recover increased costs as determined by the RCAF. The Commission asserted, however, that the ZORF provisions were more complex because they were designed both "to permit competitive profit taking" and "to prevent monopolistic gain." ICC Decision at 4–5.

Having discussed Congress' multiple purposes, the ICC concluded that under section 10707a, cost recovery increases could be taken on all rates (prescribed or nonprescribed), but ZORF increases "may not lawfully be applied to prescribed rates absent Commission approval" because in those instances the Commission had already established maximum profit levels. *Id.* at 6. The ICC reasoned that such a reading was required in order to accommodate section

10704(a)(1)'s provision prohibiting carriers from charging a different rate. The Commission also justified its result on two other grounds. First, because ICC-prescribed rates constitute a tiny percentage of all rates, the Commission's interpretation would have little effect on the goal of rate flexibility. Second, it would ensure that carriers could not use ZORF increases to extract unreasonably high rates from shippers. *Id.*

The ICC ultimately ruled that PEPCO was entitled to a refund, with interest, of all amounts attributable to CSXT's 1981 ZORF increase during the applicable statute of limitations period. CSXT has petitioned this court for review under 28 U.S.C. §§ 2321(a) and 2342(5).

## II. DISCUSSION

### A. Standard of Review

In *Chevron USA, Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court established a two-step analysis to guide judicial review of an agency's construction of its governing statute:

> First ... is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court ... must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... [Rather, it determines] whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82. To make the threshold determination of whether the statute is clear and to ascertain its plain meaning, "the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* — U.S. ——, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988).

Petitioner argues that only *Chevron's* first prong is applicable because the statute's ZORF provisions clearly indicate that Congress intended to allow a rail carrier to increase "any rate." Respondent contends that the conflicting provisions of sections 10704(a)(1) and 10707a demonstrate that Congress did not address the precise question presented (i.e., whether ZORF increases may be taken on prescribed rates), and that under *Chevron's* second step this court must defer to the Commission's interpretation, if permissible.

### B. Statutory Analysis

#### 1. *The Act's Language*

Sections 10707a(c)(1) and (d)(1) authorize a rail carrier to implement, without prior ICC approval, a ZORF increase on *"any rate* over which the Commission has jurisdiction" (emphasis added). This unambiguous language must be regarded as conclusive, absent a clearly expressed legislative intent to the contrary. *See Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987). Congress failed to make an exception for prescribed rates, despite its awareness of the ICC's prescription power. Section 10707a(a)(1)(B), for example, permits the use of adjusted, prescribed rates as the "base rate" on which ZORF increases are to be calculated, and section 10707a(h) prohibits the Commission from using its prescription authority "to limit the rates which rail carriers are otherwise authorized to establish under this subtitle."

Congress made but one exception to the application of ZORF increases, and it did so expressly. Section 10707a(d)(1) authorizes annual increases in "any rate," after October 1, 1984, "[e]xcept as provided in paragraph (3) of this subsection" (emphasis added). Paragraph (3) states that the ZORF increases authorized by the subsection will not apply in certain carefully defined circumstances. The specificity of this exception underscores the unambiguous nature of the increases otherwise authorized by subsections (c)(1) and (d)(1).

Moreover, Congress explicitly considered, and dealt with, the concern that motivated the ICC's decision—preventing carriers with adequate revenues from realizing excessive profits. In section 10707a(e)(1), Congress determined that this issue should be resolved *after* a rate increase has been filed through either a section 10707a(e)(2) agency investigation (limited to instances where the new rate would produce an excessive revenue-to-variable cost ratio) or a section 11701(b) complaint proceeding. On the other hand, nowhere in section 10707a is it suggested that a carrier must obtain prior Commission approval before taking a ZORF increase on prescribed rates.

In short, the language of the Staggers Act reflects a clear intent to permit carriers to take ZORF increases independently on "any rate." Indeed, the ICC has failed to offer a competing textual analysis of section 10707a. Although the Commission purported to "harmonize both language and intent," ICC Decision at 5, it focused almost exclusively on its understanding of the latter. The ICC has failed to explain why the provision of section 10707a(c)(1) authorizing a carrier to "increase any rate" does not mean exactly what it says.

Because the later-enacted provisions of section 10707a(c)(1) cannot be reconciled with the last sentence of section 10704(a)(1), we hold that to the extent they conflict, the former has superseded the latter. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982); *Rodriguez v. United States*, 480 U.S. 522, 107 S.Ct. 1391, 1398, 94 L.Ed.2d 533 (1987) (While "repeal by implication" is a disfavored method of statutory construction and will not be found absent a clear intent to repeal, such an intent may be inferred from an "irreconcilable conflict" between two provisions.)

In its brief, the ICC contends that even if one assumes that the two sections are incompatible, the Commission's interpretation is correct because section 10704(a)(1) is a *specific* exception (prohibiting increases on prescribed rates) that takes precedence over the *general* rule of section 10707a (allowing ZORF increases on "any rate"). The ICC, however, did not rest its decision on this "specific controls general" rule of construction. Rather, the agency argued that the two provisions could be harmonized, and conceded that "if there is an irreconcilable conflict ... there is a good argument that the older has been partially repealed." ICC Decision at 5.

### 2. *Statutory Context*

Having examined the "particular language" of section 10707a, we now look to "the language and design of the statute as a whole." *K Mart Corp.*, 108 S.Ct. at 1817. The Staggers Act represented a major restructuring of railroad regulatory law. Congress determined that the "substantive and far-reaching changes" of the Railroad Revitalization and Regulatory Reform Act of 1976 had "not achieved their intended results of significantly reduced regulatory and bureaucratic lag, increased pricing flexibility and innovative and market-responsive pricing." S.Rep. No. 470, 96th Cong., 1st Sess. 5 (1979). The purpose of the new legislation was "to promote the revitalization of the railroad industry in the United States by providing substantial regulatory reform." *Id.* at 1.

Congress specifically found that "many of the Government regulations affecting railroads have become unnecessary and inefficient; ... earnings by the railroad industry ... are insufficient to generate funds for necessary capital improvements; [and] ... modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization of railroads to save energy and combat inflation." Pub.L. No. 96–448, § 2(4), (6), and (9), 94 Stat. 1895, 1896–97 (1980). Congress made its intent absolutely clear by adopting a statement of rail transportation policy, 49 U.S.C. § 10101a, that began as follows:

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail; (2) to minimize

the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required.

At the same time, Congress reaffirmed its concern for the protection of captive shippers against excessive rates by expressing a policy "to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital." *Id.* § 10101a(6).

Our interpretation of section 10707a is entirely consistent with these objectives. Section 10707a(e) achieves the goal of overcoming "bureaucratic lag" by authorizing carriers to implement rate increases immediately without ICC interference: Subsection (1)(A) prohibits the suspension of such increases, and subsection (2) drastically curtails the Commission's investigatory jurisdiction.

While acknowledging these policy goals, the ICC nonetheless argues that the Staggers Act was a political compromise, and that Congress also intended to retain strong protection for captive shippers (e.g., against presumptively unreasonable unilateral increases in ICC-prescribed rates). We agree that Congress recognized the possibility that certain rail carriers (e.g., those in a monopoly market) might exploit their new power under section 10707a(c) and (d), and that Congress took steps to protect shippers' interests. It did so, however, by permitting shippers to challenge the reasonableness of a rate increase *after* it had taken effect rather than *before.*

Congress allows shippers to recover rate payments found to have been excessive in two ways. First, in the narrow category of cases in which the ICC has investigatory jurisdiction, ZORF increases found to be unlawful will be refunded to the shipper. *Id.* § 10707(d)(1). Second, in a complaint proceeding, a shipper will be awarded reparations to the extent that ZORF increases exceed a maximum reasonable level. *Id.* § 11705(b)(2).

In sum, our decision is consistent with the statute's objectives. It permits a ZORF increase to take immediate effect, while preserving a shipper's right to make post-filing challenges. In contrast, the ICC's position would frustrate legislative intent. By requiring prior agency approval of ZORF increases on prescribed rates, the Commission would promote the regulatory delay that Congress sought to eliminate.

### III. CONCLUSION

Both the language and the statutory context of the Staggers Act confirm that Congress intended to authorize carriers to add profit-enhancing increases to all rates, including prescribed rates, within the limits permitted by section 10707a. Accordingly, we grant CSXT's petition for review and reverse the decision of the ICC.

SO ORDERED.

HARRY T. EDWARDS, Circuit Judge, dissenting:

Under the so-called *Chevron* test, a federal court reviewing an agency's interpretation of a statute is required to engage in a two-step analysis. "[O]ur first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect...." *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987)). If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), then the question for us becomes whether the agency's construction of the statute is "permissible," *id.,* that is, one that is "rational and consistent with the statute." *United Food & Commercial Workers,* 108 S.Ct. at 421; *accord International Union, United Mine Workers v. Federal Mine Safety & Health Review Comm'n,* 840 F.2d 77, 81 (D.C.Cir.1988).

*Chevron*'s mandate is perplexing, because the rule of the case appears to violate separation of powers principles:

> The American constitutional system is based in part upon conceptions of limited and separated organs of government. The system places significant reliance upon one of those organs, the judiciary, to prevent the other two from infringing citizens' rights by exercising powers that were not conferred by the basic charter. Similarly, with respect to administrative agencies, "the function of the courts is not one of review but essentially of control—the function of keeping [them] within their statutory authority."
>
> Of course, if Congress has delegated authority to determine what the statute means, the agency's interpretation, if reasonable, must be accepted by the courts. But the vital pre-condition for this conclusion is the court's determination that the agency has been delegated the power to define the statute. To reason, as *Chevron* does, that silence or ambiguity confers that kind of interpretative authority on the agency is unacceptable, for it assumes the very point in issue and thus "fails to distinguish between statutory ambiguities on the one hand and legislative delegations of law-interpreting power to agencies on the other."

Byse, *Judicial Review of Administrative Interpretation of Statutes: An Analysis of* Chevron's *Step Two,* 2 ADMIN.L.J. 255, 261 (1988) (footnotes omitted). As Judge Leventhal aptly noted in his opinion in *Ethyl Corporation v. EPA,* 541 F.2d 1 (D.C. Cir.) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2992, 2993, 49 L.Ed.2d 394 (1976), "Congress has been willing to delegate its legislative powers broadly—and courts have upheld such delegation—because there is court review to assure that the agency exercises the delegated power within statutory limits...." 541 F.2d at 68 (Statement of Leventhal, J.) (footnote omitted). *See also* Sunstein, *Constitutionalism After the New Deal,* 101 HARV.L.REV. 421, 465–69 (1987).

The *Chevron* test is hard to square with the foregoing traditional views of the court's role in cases of statutory interpretation. Nonetheless, the rule of *Chevron* is the law of the land, and it must be followed until the Supreme Court instructs otherwise. Unless congressional intent is clear, a court is now bound to defer to the agency's reasonable interpretation of its governing statute, even if the court believes that another interpretation is preferable. The court cannot avoid deferring to the agency simply by purporting to apply *Chevron* and finding that the statute is clear when it is not.

In the instant case, the majority purports to find a clear congressional intent to allow rail carriers to take profit-enhancing "ZORF" increases on all rates, including maximum rates prescribed by the ICC prior to the enactment of the Staggers Act. Thus, the majority does not reach the second step under *Chevron* of deferring to the Commission's reasonable construction of the Act. In reality, however, the majority is not applying the *Chevron* framework at all. Rather, the majority has adopted what it believes to be the most reasonable interpretation of the ambiguous provisions of the Staggers Act, without regard to the permissibility of the construction adopted by the agency.

If it were my choice to make, I would readily embrace the majority's approach. With due respect to the views expressed by the Court in *Chevron,* I still believe that, in the final analysis, it is the court, not the agency, that should be responsible for construing congressional statutes, using traditional tools of statutory construction. However, this approach has been rejected by the Supreme Court in *Chevron* and its progeny. Because I find that the Staggers Act is *not* clear and that the ICC's interpretation of the Act is a reasonable one, I respectfully dissent.

### I.

In this case, we are asked to determine the relationship between two separate provisions of the Interstate Commerce Act ("ICA"), as amended by the Staggers Act. Under ICA section 10704(a)(1), if the ICC

finds that a rail carrier's rates are unreasonable, the Commission has the authority to prescribe a maximum future rate, and "the affected carrier may not publish, charge, or collect a different rate." 49 U.S.C. § 10704(a)(1) (1982). This provision was left completely unchanged and unqualified by the Staggers Act. Under the "ZORF" provision of the Staggers Act, however, a rail carrier may, without prior ICC approval, "increase any rate over which the Commission has jurisdiction" by any amount within the zone of rate flexibility prescribed by the statute. *Id.* § 10707a(c)(1), (d)(1). These two provisions are in clear conflict, because section 10704(a)(1) prohibits a carrier from raising a prescribed rate, while section 10707a gives carriers the authority to raise "any rate" without Commission approval.

The majority, by focusing on the language of section 10707a alone, finds that the statute unambiguously permits carriers to impose ZORF increases on all rates, including prescribed rates. Yet, "statutory meaning is of course to be derived, not from the reading of a single sentence or section, but from consideration of an entire enactment...." *Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.,* 642 F.2d 527, 533 (D.C.Cir.1980). In order to determine under *Chevron* whether congressional intent is clear, "the court must look to the particular statutory language at issue, *as well as the language and design of the statute as a whole."* *K–Mart Corp. v. Cartier, Inc.,* — U.S. —, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (emphasis added). As even the majority acknowledges, there is a "statutory conflict" between sections 10704(a)(1) and 10707a, and this conflict renders the "any rate" language of section 10707a ambiguous.

The majority resolves the conflict between the two provisions by holding that section 10707a has implicitly repealed section 10704(a)(1) to the extent that the two sections conflict. Yet, it is a contradiction in terms to say that Congress expressed a clear and unambiguous intent to effect an *implied* repeal. Moreover, repeals by implication "are strongly disfavored on the ground that Congress is normally expected to be aware of its previous enactments and to provide a clear statement of repeal if it intends to extinguish an extant remedy." *Samuels v. District of Columbia,* 770 F.2d 184, 194 n. 7 (D.C.Cir.1985); *accord Chemical Mfrs. Ass'n v. EPA,* 673 F.2d 507, 512 (D.C.Cir.1982) (the implied repeal argument is "an argument that rarely succeeds"). Rather, the court has a "duty 'to give effect, if possible, to every clause and word of a statute,' *Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 394, 27 L.Ed. 431 [(1882)], rather than to emasculate an entire section...." *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955). The majority ignores these principles, undermining the ICC's power under section 10704(a)(1) to prevent carriers from taking profit-enhancing increases when the Commission has already prescribed a maximum rate, simply in order to preserve a literal reading of the "any rate" language of section 10707a.

The majority supports its conclusion that section 10707a unambiguously allows ZORF increases on prescribed rates by determining that there is no "clearly expressed legislative intent to the contrary" and that "nowhere in section 10707a is it suggested that a carrier must obtain prior Commission approval before taking a ZORF increase on prescribed rates." Even if this observation were accurate, however, it would prove only that "Congress has not directly addressed the precise question at issue," *Chevron,* 467 U.S. at 843, 104 S.Ct. 2782, and thus that the statute is ambiguous, not that Congress addressed the question and resolved it in favor of the interpretation urged by the majority.

In fact, however, the legislative history indicates that Congress did consider the interaction between sections 10704(a)(1) and 10707a, and that Congress rejected the majority's interpretation. As passed by the Senate, the Staggers Act would have amended section 10704(a)(1) to qualify the prohibition on raising prescribed rates, by stating that carriers may not change a prescribed rate "subject to the limitations of sections 10701 and 10701a of this title." S.1946, 96th Cong., 2d Sess. § 109, 126

CONG.REC. 7294, 7297 (1980). Under the Senate bill, the ZORF provisions were added to section 10701, rather than being made into a new section 10707a as in the final bill. *See id.* § 104, 126 CONG.REC. at 7295. Thus, the Senate version would have explicitly allowed carriers to impose RCAF and ZORF increases on previously prescribed rates. This qualification of section 10704(a)(1) was deleted in conference, however, further indicating that Congress did not clearly intend to allow ZORF increases on prescribed rates.

## II.

Since congressional intent on this issue is not clear, this court must defer to the ICC's interpretation of the statute if it is reasonable. I conclude that it is.

First, the ICC's construction is consistent with the long established rule of statutory construction that "gives precedence to the terms of the more specific statute where a general statute and a specific statute speak to the same concern, even if the general provision was enacted later." *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978). To the extent that there is a conflict between sections 10707a and 10704(a)(1), the latter must take precedence over the former, because 10704(a)(1) is a specific provision dealing with a very small category of prescribed rates only, whereas 10707a is a general provision dealing with all rates. The majority refuses to consider this factor, because the Commission did not rely on it in its decision. The majority's reasoning, however, is inapposite. While on appeal we normally do not consider justifications for agency action that were not relied on by the agency below, we certainly are not precluded from looking to traditional tools of statutory construction in order to assess the reasonableness of an agency's construction of a statute.

In addition, the ICC's interpretation is consistent with Congress' intent in passing the Staggers Act. As this court noted in *Coal Exporters Ass'n v. United States,* 745 F.2d 76, 81 & n. 6 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985), the Staggers Act was a delicate political compromise, intended to provide greater flexibility to carriers while continuing to protect shippers from unreasonable rates imposed by carriers with monopoly power. Although Congress evidenced faith in marketplace competition as the best regulator, it also made it "crystal clear," S. REP. No. 96–470, 96th Cong., 1st Sess. 7 (1979), that the ZORF and RCAF provisions should not be interpreted to frustrate continued protection for shippers, where appropriate.

The instant case is precisely the type of situation in which Congress intended the ICC to be particularly vigilant, and the Commission's interpretation of the Staggers Act is consistent with this intent. As the Senate committee report noted, the rates on coal, the commodity involved in the present case,

> are of particular concern in view of the many substantial increases imposed on this traffic in the last several years.... [I]t is the Committee's intent that the Commission play an active role in insuring that such traffic bears its fair share of costs and that higher rated captive traffic is not unduly burdened.

*Id.* PEPCO's Dickerson coal traffic is such "captive traffic." *PEPCO v. Penn Central Transp. Co.,* 359 I.C.C. 222, 240 (1977). In light of Congress' clear intent to protect shippers in PEPCO's position, it was a permissible construction of the statute to determine that, when the Commission has already determined that a carrier's past rates were unreasonable and has prescribed a maximum rate,[1] the ICC retains

---

1. As the ICC acknowledges, the rates at issue in this case could not be found unreasonably high today using the criteria that the ICC applied in 1977. However, CSX remains free to petition the Commission to vacate the rate prescription if it can show that it is entitled to a higher rate under current standards. *See Burlington N.*

*R.R. Co. v. ICC,* 679 F.2d 934, 940 (D.C.Cir.1982) (noting that it would be "wholly arbitrary and capricious" for the ICC to refuse to vacate a rate prescription that could not be found unreasonable after enactment of the Staggers Act). In fact, the ICC has shown its willingness to vacate rate prescriptions based on the same standard

the ability to enforce those rates unless the carrier proves that a change in the situation justifies a profit-enhancing increase.

The majority expresses concern that the Commission's interpretation would lead to the very regulatory delay that Congress sought to avoid in the Staggers Act. However, the possibility of delay is of less concern when the carrier desires to impose a profit-enhancing increase than when it needs the increase in order to keep up with inflation. Under the Commission's interpretation, carriers could take inflation-based RCAF increases even on prescribed rates without any delay. Only if the carrier wished to increase its profits on a rate that the Commission had already determined to contain the maximum permissible profit would the carrier be forced first to seek Commission approval. The Staggers Act expresses a clear congressional intent to deny ZORF increases to carriers that already are receiving adequate revenues, and it was fully consistent with the statutory scheme to limit a carrier's ability unilaterally to impose profit-enhancing ZORF increases in the small class of cases in which the Commission has found it necessary to prescribe a maximum rate.

### III.

Because I believe that the statute is ambiguous and that the agency's interpretation is a reasonable one that comports with congressional intent, I would deny the petition for review.

as in CSX's case. *See Consolidated Rail Corp.,* 364 I.C.C. 615, 619 (1981) (finding that the rate prescription could not be imposed under current standards and that the prescription was

inconsistent with the Staggers Act's policy of giving carriers flexibility to earn adequate revenues).