CITY OF LONG BEACH, as trustee for the State of California, Plaintiff–Appellant,

v.

STANDARD OIL COMPANY OF CALIFORNIA; Texaco, Incorporated; Exxon Corporation; Union Oil Company of California; Mobil Oil Corporation; Shell Oil Company, Defendants–Appellees.

STATE OF CALIFORNIA, on behalf of itself and all political subdivisions and special districts within the state similarly situated, Plaintiff–Appellant,

v.

STANDARD OIL CO., et al., Defendants–Appellees.

CITY OF LONG BEACH, Plaintiff–Appellant,

v.

STANDARD OIL CO., et al., Defendants–Appellees.

In re: COORDINATED PRETRIAL PROCEEDINGS IN PETROLEUM PRODUCTS ANTITRUST LITIGATION—MDL 150.

Nos. 86–5859, 86–5860.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1988.

Decided April 17, 1989.

Shirley M. Hufstedler, Hufstedler, Miller, Carlson & Beardsley; Royce H. Schulz and Gary L. Halling, Broad, Schulz, Larson & Wineberg, Gary W. Hoecker and M. Brian McMahon, Hoecker, McMahon & Wade, Los Angeles, Cal., for plaintiffs-appellants City of Long Beach and State of Cal.

John R. Calhoun, City Atty., and James N. McCabe, Deputy City Atty., City of Long Beach, Long Beach, Cal., for plaintiff-appellant City of Long Beach.

John K. Van de Kamp, Atty. Gen., Sanford N. Gruskin, Asst. Atty. Gen., Richard N. Light, Deputy Atty. Gen., State of Cal., for plaintiff-appellant State of Cal.

Andrew J. Kilcarr and Maureen O'Bryon, Hogan & Hartson, Washington, D.C., Charles F. Rice, New York City, for the defendant-appellee Mobil Oil Corp.

Anthony P. Brown, Philip L. Judson, Paul R. Griffin, and Craig E. Stewart, Phillsbury, Madison & Sutro, San Francisco, Cal., for defendant-appellee Chevron Corp.

Philip K. Verleger and David A. Destino, McCutchen, Black, Berleger & Shea, Los Angeles, Cal., Kenneth P. Fountain, Houston, Tex., for defendant-appellee Exxon Corp.

John S. Kingdon and Alan M. Grimaldi, Howrey & Simon, Washington, D.C., Raymond V. McCord, Los Angeles, Cal., for defendant-appellee Shell Oil Co.

Milton J. Schubin, Barry Willner and Aton Arbisser, Kaye, Scholer, Fierman, Hays & Handler, New York City, Robert D. Wilson, White Plains, N.Y., for defendant-appellee Texaco, Inc.

Darryl Snider, Henry J. Kupperman, Scott J. Koepke and Michael W. Biren, Brobeck, Phleger & Harrison, and Harold E. Zohner, Los Angeles, Cal., for defendant-appellee Union Oil Co.

Before SCHROEDER, FARRIS and POOLE, Circuit Judges.

FARRIS, Circuit Judge:

The City of Long Beach and the State of California appeal the district court's grant of summary judgment to the defendants, six major California oil companies.[1] The city charged the companies with conspiring to depress the posted price of crude oil in violation of federal and state antitrust laws.[2] The record satisfies us that the plaintiffs presented sufficient evidence to establish genuine issues of material fact in support of their claims. We reverse and remand for trial.[3]

---

1. The defendants-appellees are Standard Oil Co. of California (now Chevron Corp.), Exxon Corp. (formerly Humble Oil & Refining Co.), Mobil Oil Corp., Shell Oil Co., Texaco, Inc., and Union Oil Co. of California. The seventh defendant, Atlantic Richfield Co., settled with plaintiffs and was dismissed from these suits on December 13, 1984.

2. Three consolidated cases are involved in this appeal. D.C. No. CV-75-2232 was filed in June 1975 by the City of Long Beach; counts one and two of the second amended complaint alleged antitrust violations in the defendants' purchase of oil produced from lands owned in trust by the city for the benefit of the State of California. D.C. No. CV-76-2839 is a class action suit by the State of California on behalf of itself and its political subdivisions; the fifth cause of action of the second amended complaint alleged a conspiracy to depress crude oil prices and was severed and consolidated with No. 75-2232.

The district court certified its summary judgment award on the antitrust claims as final under Fed.R.Civ.P. 54(b).

D.C. No. CV-82-3252 was filed by the City of Long Beach in June 1982 and alleged federal and state antitrust claims for oil produced from lands owned by the city in its proprietary capacity, as opposed to as trustee.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

3. We also decide today in a separate opinion an appeal from the district court's award of summary judgment against the city on the pendent state contract claims included in the complaint filed in D.C. No. CV-75-2232. *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1410 (9th Cir.1989). That opinion also considers the removal of state law claims, originally filed in state court in 1986, concerning a later time period.

## BACKGROUND

The City of Long Beach, both as trustee for state lands and as proprietor, owns oil produced from the Wilmington Oil Field. *See* 1964 Cal.Stats., Ch. 138 (1st Extra. Sess.). The field extends 11 miles southeast from the Wilmington District of Los Angeles through Long Beach Harbor and the offshore area of the City of Long Beach. Production from the 7,825 acre onshore portion began in the 1930's. In 1954, the city planned and supervised a seismic survey to determine the extent of the southeasterly offshore portion of the field. Problems with land subsidence arising from the onshore production delayed development of the offshore oil. In February 1962, after the preparation of a comprehensive development plan by the Harbor Department, city voters approved offshore drilling. The California State Lands Commission approved the city's proposal to develop the 6,400 acre offshore area in late 1964.

In order to develop and market the oil from the 1.5 billion barrel field, in March 1965 the city sold interests in its production. The interests were awarded for a 35-year period based on bids for a percentage of the expected market price of the oil. A consortium composed of five of the companies (Texaco, Exxon, Union, Mobil, and Shell) obtained an 80% share, which also obligated the group to perform day-to-day operations as Field Contractor. Chevron and ARCO jointly obtained shares totalling 10% of production. The remaining 10% share went to companies not involved in this litigation. The winning bids ranged from 95.56% for the Field Contractors' share to 100% for a 5% share won by Chevron and ARCO.

A Contractors' Agreement, executed by the parties in March 1965 after two years of preparation and discussion, contained detailed pricing provisions for the oil sold to the companies.[4] The price was based substantially upon the arithmetical average of prices "posted" during the month by major purchasers in the Wilmington field and other named fields. Posted prices are prices that a prospective purchaser publicly declares it is willing to pay for crude oil. Chevron, ARCO, Mobil, and Union were the only purchasers to regularly post prices in the Wilmington field.

In 1975, the City of Long Beach and the State of California brought suit against seven major California oil companies charging violations of federal and state antitrust statutes. The city alleges that the companies conspired to fix and maintain uniform, noncompetitive posted prices for the kind of crude oil produced from the Wilmington field, and that those postings were below the prices that buyers in a free, open market would have paid.

The district court granted summary judgment on several alternative grounds. On July 19, 1984, the court entered partial summary judgment for the companies for the period April 12, 1972 to October 1, 1976, concluding that federal price controls supplanted the alleged conspiracy as the effective reason for the crude oil price levels. On December 17, 1984, the court entered partial summary judgment for the period November 1, 1974 through 1977, based on the federal Entitlements Program's effect on the value of the city's oil. On September 19, 1985, the court entered a complete summary judgment for the companies. The court found that the federal Mandatory Oil Import Program precluded recovery for the remaining period of alleged liability, June 27, 1971 to April 12, 1972, and as an alternative ground that the city had failed to present sufficient evidence to prove the alleged antitrust conspiracy.

We review the district court's grant of summary judgment de novo. *Harkins Amusement Enterprises, Inc. v. General Cinema Corp.*, 850 F.2d 477, 482 (9th Cir. 1988), *cert. denied,* — U.S. ——, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989). To overcome summary judgement the non-moving party "must establish that there is a genuine

---

**4.** A more detailed discussion of the pricing provisions is contained in our companion opinion

on the contract claims.

issue of material fact" and demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968), Fed.R.Civ.P. 56(e)).

In reviewing the summary judgment motion we accept the city's undisputed allegations as true:

(1) The California oil market is isolated and dominated by the defendant companies. This dominance encompasses the production, transportation, and refining sectors of the industry.

(2) The posted prices for heavy crude oil generally were stable throughout the period of the alleged conspiracy (1961–1977). Price increases did occur in 1969, 1970, and 1973.

(3) The composition of crude oil varies. Heavier-weight crudes generally are less desirable for refinery feed stock than lighter-weight crudes. For a given refinery configuration, the lighter-weight crude can be refined into a larger volume of more valuable "light" products (i.e., gasoline as opposed to fuel oil). Alternatively, a greater capital investment in refinery equipment is required to produce light products from a heavy crude. As a result of this difference in value, lighter weight crude generally is more expensive than heavier weight oil. Crude oil weight is measured on gravity scale in degrees. The difference in price for crude oils of varying weights on a posted price schedule is known as the "gravity price differential." The oil owned by the city was a heavy crude.

(4) The companies engaged in barter transactions, called three-cut exchanges, to move oil from fields to refineries as efficiently as possible. The accounting for the substantial volumes of oil traded in three-cut exchanges was not done on the basis of posted prices, but on refinery product yields adjusted to balance volumes.

(5) In 1961–62, employees of five out of the six defendant companies met to discuss and revise the technical specifications for the three-cut exchanges. The parties disagree over whether the meetings were secret and whether the city was aware of the widespread use of three-cut exchanges.

## DISCUSSION

### A. Legal Standard

Section 1 of the Sherman Act declares illegal "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce...." 15 U.S.C. § 1. Section 4 of the Clayton Act allows any person "injured in his business or property by reason of anything forbidden in the antitrust laws [to] recover threefold the damages by him sustained...." 15 U.S.C. § 15(a).

To maintain a successful action, the city must show a contract, combination, or conspiracy that restrains trade and causes harm to itself and to competition in general. *See Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1172 (9th Cir.1988); *see also USA Petroleum Co. v. Atlantic Richfield Co.*, 859 F.2d 687, 697 (9th Cir.1988) (concluding that injury done to market and to competitors by vertical, non-predatory, maximum price-fixing conspiracy is antitrust injury). The city must present "direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). Although conspiracy may be inferred from circumstantial evidence, the evidence must tend to exclude the possibility that the defendants acted independently and lawfully. *Id.* at 763–64, 104 S.Ct. at 1470–71; *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 525 (9th Cir.1987). In analyzing the evidence at the summary judgment stage of an antitrust action, "plaintiffs should be given the full benefit of their

proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) (remanding for new trial); *Wilcox*, 815 F.2d at 526.

The city claims that the three-cut exchange agreement is unlawful *per se.* Whatever the effect of the three-cut exchanges on posted prices, the agreement concerning the exchanges themselves cannot be flatly classified as a price-fixing arrangement. *Cf. Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 349–51, 102 S.Ct. 2466, 2475–77, 73 L.Ed.2d 48 (1982). On their face, the three-cut exchanges cannot be held to have a single purpose of stifling competition. As explained below, the exchanges have other justifiable purposes, and so should be scrutinized under the Rule of Reason. *See Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979); *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir.1987); *see also Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 1519–20, 99 L.Ed.2d 808 (1988).

### B. The Conspiracy

■ The city claims that the companies violated the antitrust laws by conspiring to maintain an artificially low posted price for Wilmington oil. The city alleges that the companies accomplished this by using three-cut exchanges and artifically high gravity price differentials to maintain a dual price structure. Posted prices allegedly were kept low to reduce the companies' payments to the city for the publicly-owned Wilmington oil, while the companies used three-cut exchanges to maintain market values in transactions among themselves. The city further alleges that in the absence of this anticompetitive behavior, market forces would have increased the price of the Wilmington oil. More specifically, the city asserts that:

1) In their posted prices, the defendants systematically undervalued heavy crude oils, resulting in the underpricing of the city's oil.

(2) The gravity price differentials for the companies' posted prices were artificially large in comparison to the value of the oil in the market place, resulting in the underpricing of the city's oil.

(3) The purpose of the three-cut exchange was to escape the problematic consequences of the deliberate underpricing in posted prices of the city's oil. The three-cut exchanges enabled the companies to trade crude oil at market value and avoid the market distortions caused by the artificially low posted prices.

(4) The 1961–62 technical meetings were held secretly to further this purpose.

(5) The companies operated their private pipelines, adhered to posted prices, exchanged price information, and set the gravity price differentials for Alaska Cook Inlet oil in a manner that assisted their policy of underpricing heavy California oil.

(6) The companies experienced shortages of heavy crude oil in California such that, in an open market, higher prices would have resulted.

(7) The refinery value of various crude oils—that is, the dollar value of the products obtained from processing a given barrel of oil in a particular refinery—is material to the pricing issues raised by the antitrust claims.

(8) The federal Mandatory Oil Import Program, in effect from 1959–73, did not prevent the companies from increasing crude oil prices.

(9) Neither federal price controls, first imposed in 1971, nor the federal Entitlements Program, implemented in 1974 to correct inequities among refiners using controlled-price crude oil versus exempt or imported oil, caused the alleged depressed price for the city's oil.

To prove its case at trial, the city must convince the trier of fact that the companies conspired, or at least acted in concious parallel, to fix and post artificially high gravity price differentials resulting in the

city's receiving artificially low prices for its crude. The city has provided no direct evidence that such a conspiracy or conscious parallelism occurred. However, it has provided evidence of circumstances that point to the existence of such a conspiracy.

The record shows that the companies widely used the three-cut exchange system as an alternative to valuing barter transactions at posted prices. The companies held meetings in 1961 and 1962 to ensure that the three-cut exchange system more accurately reflected the value of the crude to the bartering parties. The record also shows that the three-cut exchange system was cumbersome and inconvenient to maintain. The city alleges that the the companies used such a technically intricate system, rather than valuing the crude at posted prices, because the posted prices for heavier crudes were fixed to cheat sellers of crude. Although the parties agree that barter transactions were necessary to everyday oil operations, the city argues that the three-cut exchange system enabled the companies to value the crude bartered among themselves in a manner that avoided the rigged posted prices. The city cites the companies' efforts to maintain the three-cut exchange system as evidence that all the companies knew the posted prices were improper. The unusual effort put into the maintenance of the three-cut exchange system does constitute circumstantial evidence of conspiratorial price fixing.

When only circumstantial evidence of a conspiracy is offered, a defendant is entitled to summary judgment if it provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 632 (9th Cir.1987). For example, parallel changes in prices and exchanges of price information by competitors may be motivated by legitimate business concerns. *See Wilcox*, 815 F.2d at 526–27. The companies explain, with support in the record, that the three-cut exchanges had been ongoing, the 1961–62 meetings were held to address valid technical issues only tangentially related to pricing, and the posting system itself was lawful.

The city presents evidence to rebut the companies' explanation for their conduct. The three-cut exchanges were cumbersome and inconvenient. At various times, market conditions should have caused some of the companies to post higher crude prices. Posted prices often did not correspond to market value. At least one company acknowledged that an increase in the posted price would result in increased payments to Long Beach. A question also is raised by ARCO's requirement that it be indemnified for potential liability to the city arising from use of the three-cut exchanges.

The city raises a genuine issue of material fact over whether shortages of heavy crude oil existed and should have caused an increase in posted prices. The district court incorrectly concluded that the city's evidence related only to anticipated shortages. It also erred in relying on a 1978 statement to Congress by the California Comptroller that a surplus of domestic crude existed in the region. The statement is largely irrelevant to this suit because it was made after the July 1977 entry of Alaska North Slope oil into the California market.

The district court found that the city's analysis of marginal refinery values had no significance. Although the questions raised by the district court would be valid cross-examination, the refinery value analysis is relevant, material evidence. It would assist the trier of fact in the search for truth, Fed.R.Evid. 702, and its probative value is not outweighed by the danger of misleading the jury, Fed.R.Evid. 403. Given the companies' dominance of the market, the analysis is critical in proving damages. *See Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 529–30 (9th Cir.1986) (finding introduction of expert opinion essential); *compare McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 806–07 (9th

Cir.1988) (finding expert opinion properly excluded because based on unsupported assumptions and flawed analysis).

Under the doctrine of conscious parallelism, an agreement may be inferred if each participant knew that concerted action was contemplated and invited, gave its adherence to and participated in the scheme, and understood that cooperation was essential to the plan. *Barry v. Blue Cross of California*, 805 F.2d 866, 869 (9th Cir.1986) (citing *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939)). The record shows that the companies were aware of the disparity between posted prices and three-cut exchange values and of the disparity between the posted prices and refining values for heavy crude oils. Each knew that the participation of all the companies was necessary to make the plan work, and, with the exception of Exxon, actively participated in the meetings to maintain the utility of the three-cut exchanges. Each engaged in three-cut exchanges. Because the companies dominated the relevant market, each understood the necessity of cooperation. *See Barry*, 805 F.2d at 869 (knowledge that cooperation is essential shown by oligopolistic market structure); *see also* Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 Stan.L. Rev. 1562, 1575–1587 (1969) (viewing noncompetitive pricing by oligopolists as collusive and § 1 of Sherman Act as appropriate remedy).

Additionally, the district court recognized that four of the six companies—Chevron, Union, Mobil, and Shell—had substantial incentives to conspire. The district court disregarded the city's explanation of the incentives to conspire, such as access to pipelines and long term refining plans, for Texaco and Exxon. The record shows that the companies all recognized that artifically maintaining lower posted prices was in their best interests. Whether this evidence will support at least an inference of an agreement among the companies is a question for the trier of fact.

Genuine issues of material fact exist over the effect of the Mandatory Oil Import Program on oil prices from 1959–1973. The program's primary purpose was to promote national security by encouraging domestic oil production. Presidential Proclamation No. 3279, 3 C.F.R. 11 (1959–63 Comp.); *see Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 552, 96 S.Ct. 2295, 2299, 49 L.Ed.2d 49 (1976). The companies argue that crude prices were low because the import program also sought to stabilize domestic crude oil prices. The record contains significant, persuasive evidence that the import program was not intended to prevent crude oil prices from rising and would have allowed the price for the city's oil to increase.

Genuine issues of material fact exist with regard to the Entitlements Program. The program aimed to increase the cost to refiners of controlled oil, such as the city's, to roughly equal the cost of uncontrolled oil. Long Beach has shown that the controlled price for the city's oil may have been greater in the absence of the conspiracy. Therefore, the program does not excuse the companies from potential antitrust liability. However, we recognize that the existence of the Entitlements Program may affect potential damages significantly.

The city has raised genuine issues of material fact. It has presented significant evidence of an antitrust conspiracy that tends to exclude the possibility of independent action. An inference of collusive action reasonably and plausibly may be made based on the evidence presented. Unlike *Matsushita*, this is not a case of legitimate price competition or an implausible predatory pricing scheme. *Cf.* 475 U.S. at 588–95, 106 S.Ct. at 1357–61. A trier of fact must evaluate the substantial evidence in the record in support of the city's antitrust claim.

## C. Price Controls and Legal Injury

■ The district court barred the Long Beach claims because during all but a few

months of the damage period, it found that federal price control programs, and not the companies' actions, were the legal cause of the alleged injury—underpriced crude oil. Because Long Beach had no right to receive prices greater than the federal ceiling price for its oil, the court found that it had suffered no legal injury and therefore had no claim for relief.

Long Beach argues that the companies conspired to set an artificially low price for crude oil, and in the absence of that conspiracy, the price controls imposed by the federal government after the conspiracy began would have had a higher ceiling. The companies respond that the crude oil prices were limited by the federal government with full knowledge of the allegation that they were too low, and therefore the federal government, and not the companies, was the "supervening" legal cause of any injury suffered by Long Beach. The companies make the ambitious claim that, as a matter of law, they should be shielded from antitrust liability because the low prices of which Long Beach complains were set by a government agency.

The district court made detailed findings of fact on the relationship between the price control program and the companies' prices for crude oil. The court found that price control administrators had rejected, at several points beginning on April 12, 1972, the arguments of California producers that crude oil prices were too low. The court concluded that even if Long Beach could prove a price-fixing conspiracy, as a result of the actions of federal price control administrators from April 12, 1972, until October 1, 1976, Long Beach had no right to any damages. The court reasoned that the city suffered no legal injury because the companies paid the city all that the law allowed, and therefore should not be liable for any additional amounts. We understand but reject the argument.

The establishment of price ceilings by the federal government, after the alleged conspiracy began, does not in itself mean that the companies' conduct could not have caused the injuries. If unlawful underpricing did occur, the harmful effects continued. If historical prices had been higher, the ceiling prices might have been higher "but for" the alleged conspiracy. *See Woods Exploration and Production Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1292–98 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). *Woods* was a federal antitrust action in which the plaintiffs charged that the defendants filed false natural gas production forecasts with the Texas Railroad Commission in order to reduce the production allowances for the plaintiffs. The district court granted partial summary judgment for the defendants on the ground that the plaintiffs were not entitled to recover damages, because the Texas Railroad Commission, and not the defendants, set the allowances. The Fifth Circuit reversed and remanded for trial, stating that because the Commission's actions were based on false information, liability existed. *Id.* at 1295–98; *see also City of New Orleans v. United Gas Pipe Line Co.,* 517 So.2d 145, 156 (La.App.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 273, 102 L.Ed.2d 262 (1988) (holding delivery obligations under gas contract not superceded by federal orders because company's earlier failures to obtain supplies caused problem). In this case, if the price ceilings were based on prices set artificially low as a result of an unlawful conspiracy, liability should still exist.

The companies incorrectly characterize the price control program as a supervening or superceding cause of the injury to the city. The city does not argue that the companies conspired to influence the price control program or that the price control program was the cause of its injury. *Cf. United Mine Workers v. Pennington,* 381 U.S. 657, 670–71, 85 S.Ct. 1585, 1593–94, 14 L.Ed.2d 626 (1965) (no antitrust liability for joint efforts to influence government officials or for injuries resulting from related action by government official); *Okenfenokee Rural Electric Membership Corp. v. Florida Power & Light Co.,* 214 F.2d 413, 418 (5th Cir.1954) (no antitrust liability for

injuries resulting from valid government action denying construction permit). Mere ratification by government officials does not absolve an otherwise illegal conspiracy. *See Woods,* 438 F.2d at 1298. If Long Beach can persuade a fact-finder that the price of crude oil would have been set at a different level but for the allegedly illegal agreement, it is entitled to damages. It overcomes summary judgment in presenting sufficient evidence to raise a genuine issue of material fact as to whether price controls would have been set at a different level in the absence of the alleged conspiracy.

A related question is whether the setting of price ceilings under the authority of the Economic Stabilization Act effectively should shelter the companies from antitrust liability for conduct not specifically approved by the act. *See Petroleum Products Antitrust Litigation,* 830 F.2d 198, 201 (Em.App.), *cert. denied,* —— U.S. ——, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987). In other words, does federal price regulation displace private antitrust regulation? If a substantive, comprehensive regulatory scheme exists, the Court has found that the private damages provisions of the antitrust laws are not an available remedy. *See Square D Co. v. Niagra Frontier Tariff Bureau,* 476 U.S. 409, 422, 106 S.Ct. 1922, 1930, 90 L.Ed.2d 413 (1986) (citing *Keogh v. Chicago and N.W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922)).

■■■ The district court's analysis implies that during a period of price controls, antitrust claims involving conspiracies to underprice, such as predatory pricing or the alleged agreement in this case, may not be pursued in the courts. For a regulatory program, such as price controls, to displace an antitrust claim the relief desired must be available from the regulatory agency. *Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 679 (9th Cir.1985) (citing *Keogh* ). An exemption will be implied if necessary to give the regulatory statute full effect. *Barnes,* 759 F.2d at 679; *Foremost Inter-*

*national Tours v. Quantas Airways Ltd.,* 525 F.2d 281, 284 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *see* Areeda & Turner, *Antitrust Law,* ¶ 224 (1978). Unless the conflict between the regulatory decision and antitrust liability is obvious, as with comprehensive ICC regulation of railroad rates and practices, the Court will not find an implied repeal of the antitrust laws. *See* Von Kalinowski, *Antitrust Laws & Trade Regulation* § 44A.02[2] (1988). If the challenged activity is beyond the scope of the regulatory body, no exemption will be found. *Barnes,* 759 F.2d at 679.

Implied repeals of the antitrust statutes are disfavored, and require a convincing showing that the antitrust laws and the regulatory program cannot coexist. *National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City,* 452 U.S. 378, 388–89, 101 S.Ct. 2415, 2421–22, 69 L.Ed.2d 89 (1981). Long Beach points to substantial administrative and legislative history that tends to show that the price control statutes were not intended to supplant the antitrust statutes. Additionally, the 1973 Emergency Petroleum Allocation Act, which continued price controls on crude oil, contained a provision prohibiting any construction of its provisions that would create any defenses to antitrust actions. Pub.L. No. 93–159, § 6 (1973), 15 U.S.C. § 755(c) (provision effective from 1973–1975, repealed by § 453, Energy Policy and Conservation Act, Pub.L. No. 94–163 (1975)); *see Typhoon Car Wash, Inc. v. Mobil Oil Corp.,* 770 F.2d 1085, 1089–90 (Em.App.), *cert. denied,* 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985).

The price ceilings set by the government were based on prices in effect at the time controls were imposed. The price control administrators did not examine the antitrust claims of the city. No independent analysis, comparable to the ratemaking in *Keogh,* was performed. Without such an independent analysis, the government's actions do not immunize the companies from civil antitrust liability. *See Foremost In-*

*ternational Tours,* 525 F.2d at 285–87; Areeda, *supra,* at ¶¶ 224, 225. The existence of price controls will affect the determination of potential damages but does not absolve the companies of antitrust liability.

## CONCLUSION

Long Beach presented sufficient evidence to raise genuine issues of material fact in support of its conspiracy claims, and to overcome the defenses that the Mandatory Oil Import Program, the Entitlements Program, or federal price controls were the cause of the alleged depressed price for its crude oil.[5]

REVERSED and REMANDED for trial.

---

5. In *Petroleum Products Antitrust Litigation,* 830 F.2d 198 (Em.App.), *cert. denied,* —— U.S. ——, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987), the Temporary Emergency Court of Appeals considered an interlocutory appeal by the city of the partial summary judgment dismissing the antitrust claims beginning April 12, 1972, because of the effect of federal price controls. TECA ruled that the issues raised were nonjusticiable until the underlying antitrust liability was resolved. *Id.* at 203. TECA noted that two issues were potentially within its sphere of authority, and could be appealed to it if and when justiciable:

   A. Whether or not 6 C.F.R. Sec. 101.-34(a)(2), which exempted state and local governments from price controls under cer-

tain circumstances, applied to sales of "net profits oil" by appellants during the periods April 12, 1972 to June 13, 1973, and August 19, 1973 to October 25, 1973?

. . . . .

   C. Whether or not compliance with Phase III price controls was "voluntary" during the period of January 11, 1973 to June 13, 1973 so that appellees were not prohibited from making appropriate price adjustments for the crude oil sold by appellants during this period?

*Id.* at 200, 203. We did not consider the above issues, and express no opinion on the appropriate time for the parties to raise them with TECA.