UNION PACIFIC RAILROAD COMPA-
NY and its Lessors, Plaintiff–Coun-
ter–Defendant–Appellee,

v.

NEVADA POWER CO., a Nevada
corporation, Defendant–Counter–
Claimant–Appellant.

No. 89–16471.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1991.

Decided Dec. 11, 1991.

Michael J. Ogborn, Heron, Burchete, Ruckert & Rothwell, Denver, Colo., and M. Gene Matteucci, Nevada Power Co., Las Vegas, Nev., for defendant-counter-claimant-appellant.

Robert B. Batcheler, Union Pacific R. Co., Omaha, Neb., and Mark L. Gentile, Miles, Pico & Mitchell, Las Vegas, Nev., for plaintiff-counter-defendant-appellee.

Before GOODWIN, THOMPSON and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

Nevada Power Company ("Nevada Power") operates a coal-fired electricity-producing plant near Moapa, Nevada. Since 1978, Union Pacific Railroad Company ("Union Pacific") has transported coal to the plant from Hiawatha, Utah, and other stations along the Utah Railway.[1] From the very

---

1. All pertinent coal shipments originate along a     98–mile stretch of track between Mohrland and

inception of this relationship, the parties have disagreed over the proper transportation rate. This dispute remains unresolved today.

The present matter is but one facet of this lengthy rail tariff dispute. Following a rate determination by the Interstate Commerce Commission ("ICC" or "Commission") in 1979, Union Pacific paid Nevada Power over $1.6 million in reparations for overcharges. Later, the United States Court of Appeals for the Tenth Circuit vacated the ICC's order. Union Pacific then filed this suit in federal district court, seeking a return of its reparation payments.

## I

A brief overview of the Interstate Commerce Act is necessary to understand the factual context of this case.[2]

A cornerstone of rate-setting jurisprudence is the filed rate doctrine. "The 'filed rate doctrine,' in its most basic form, 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.'" *Taffet v. Southern Co.*, 930 F.2d 847, 855 (11th Cir.1991) (quoting *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981)). As applied to railroads and other common carriers, the doctrine is codified at 49 U.S.C. § 10761, which provides in pertinent part that a "carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff." The doctrine distinguishes between a "legal" rate and a "lawful" rate. *See Southern Pacific Transp. Co. v. San Antonio*, 748 F.2d 266, 273 (5th Cir.1984).

The legal rate is the tariff rate published and filed with the I.C.C. The lawful rate is a legal rate which has also been determined by the Commission to be reasonable and acceptable under the requirements of the Interstate Commerce Act. *Id.* at 273-74.

There is, however, an important caveat to the filed rate doctrine. When a rail carrier has "market dominance over the transportation to which a particular rate applies," the rates established by the carrier must be reasonable. *See* 49 U.S.C. 10701a(b)(1); *see also Maislin Indus., U.S. v. Primary Steel, Inc.*, — U.S. —, 110 S.Ct. 2759, 2767, 111 L.Ed.2d 94 (1990); *Arizona Public Serv. Co. v. United States*, 742 F.2d 644, 647 (D.C.Cir.1984) ("ICC must find that the railroad has 'market dominance over the transportation to which the rate applies' as a prerequisite to exercising its power to determine the reasonableness of the rate"). On complaint by an interested party—or on its own initiative—the ICC may begin an investigation to determine the reasonableness of a rate. 49 U.S.C. §§ 10707(a), 11701; *see also CSX Transp. v. United States*, 867 F.2d 1439, 1440 (D.C.Cir.1989). If the ICC finds a rate to be unreasonable, the ICC is authorized to order the carrier to pay the shipper damages for overcharges, 49 U.S.C. § 11705(b)(2); the Commission may also prescribe a maximum future rate. 49 U.S.C. § 10704(a)(1); *see also CSX Transp.*, 867 F.2d at 1440.

These ICC orders are reviewable by the courts of appeals. *See* 28 U.S.C. § 2342(5). However, "federal-court authority to reject Commission rate orders for whatever reason extends to the orders alone, and not to the rates themselves." *Burlington Northern, Inc. v. United States*, 459 U.S. 131, 141, 103 S.Ct. 514, 521, 74 L.Ed.2d 311 (1982). Such limited appellate court review

Provo, Utah. This track is operated by the Utah Railway Company. From Provo, the coal is transported to Nevada by Union Pacific. Utah Railway was a party to all proceedings before the I.C.C., but is not a party here.

**2.** The Interstate Commerce Act was originally enacted in 1887. Although the Act has been amended numerous times since, two amendments are of particular relevance here. First, in 1976 Congress enacted the Railroad Revitaliza-

tion and Regulatory Reform Act ("4R Act"). Four years later, Congress further deregulated the railroad industry with the Staggers Rail Act of 1980. Since the facts underlying the present dispute occurred prior to 1980, the 4R Act amendments are considered, while the Staggers Act is inapplicable. We note, however, that little, if any, of our analysis is implicated by the Staggers Act.

is necessary to preserve the primary jurisdiction vested by Congress in the ICC. *See Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 821–23, 93 S.Ct. 2367, 2381–82, 37 L.Ed.2d 350 (1973); *Southern Pacific,* 748 F.2d at 272.

If a shipper pays on a tariff whose rate is later declared unreasonable, the shipper may recover reparations from the carrier. *See* 49 U.S.C. § 11705(b)(3); *Burlington Northern,* 459 U.S. at 141–42, 103 S.Ct. at 520–21. However, a carrier's ability to recover reparations is more restrictive. The Supreme Court explained:

> Under § 207(d)(2) of the Staggers Rail Act of 1980, 49 U.S.C. § 10707(d)(2), the carrier can also receive reparations. This right is limited, however, to underpayments resulting from the *Commission's* suspension of a tariff; it does not apply where ... a *court* has prevented the carrier from collecting a higher tariff.

*Id.* at 142 n. 6, 103 S.Ct. at 521 n. 6 (citations omitted).

Each of these various statutory maxims is implicated in Union Pacific's present attempt to recover reparation payments from Nevada Power.

## II

Union Pacific began transporting coal from Utah to Nevada Power's Reid Gardner Station in 1978. Prior to October 1978, the set group rate for such coal shipments was $7.07 per ton for a minimum shipment of 4,000 tons. On August 27, 1978, Union Pacific published Tariff 6034, which established a point-to-point rate of $9.21 per ton if annual volume exceeded 350,000 tons and each shipment exceeded 7,600 tons. A fallback rate of $10.41 per ton was set for annual volumes of 150,000 to 350,000 tons, again assuming a minimum of 7,600 tons per shipment. Shortly thereafter, at Nevada Power's request, Union Pacific published a new group rate schedule. Tariff 6020, published on October 27, 1978, set a group rate of $10.90 per ton with no mandatory minimum annual volume.

Nevada Power filed a protest of the Tariff 6034 rates with the ICC, asking the ICC to suspend and investigate the rates. The ICC agreed to investigate and on July 31, 1979, the Commission entered its decision canceling the Union Pacific's rates of $9.21 and $10.41 per ton. *See Bituminous Coal, Hiawatha, Utah to Moapa, Nevada,* 361 I.C.C. 923 (1979). The ICC did not specify an alternative rate structure. However, the ICC concluded that the maximum reasonable rate for annual volume exceeding 350,000 tons was $7.91 per ton. The Commission ordered Union Pacific to refund to Nevada Power the difference between the Tariff 6034 rate and the $7.91/ton rate.

Upon the ICC's rejection of Tariff 6034, Union Pacific did not publish a new tariff reflecting rates consistent with the ICC's analysis. Rather, Union Pacific contended that the group rates found in Tariff 6020 went into effect, and proceeded to charge Nevada Power accordingly.

Nevada Power again protested to the ICC. The ICC, in an order dated April 15, 1980, found for Nevada Power. Union Pacific and Utah Railway, the ICC declared, "violated our decision in this case. In addition, elimination of the annual volume rates for these movements was a violation of their statutory common carrier obligation to provide adequate service." The ICC reasoned that "unit train/annual volume movements are the only efficient and practical means of transporting large volumes of coal."

The ICC ordered Union Pacific to refund to Nevada Power the difference between the Tariff 6020 rate ($10.90/ton) and the rate it had previously found reasonable ($7.91/ton).[3] Eventually—and not without protest—Union Pacific paid Nevada Power reparations exceeding $1.6 million, approximately one million stemming from overcharges for the period in which Tariff 6034 was in effect, and approximately $600,000

---

3. As a result of an unrelated ICC decision, on January 18, 1980, Union Pacific published a new tariff setting a transportation rate of $7.91 per ton. This new rate went into effect on January 28, 1980.

for overcharges stemming from Tariff 6020 overcharges.

Meanwhile, all of the parties before the ICC petitioned the Tenth Circuit for review of the ICC's order. On January 8, 1981, the Tenth Circuit set aside the ICC's decision, finding several irregularities in the ICC's decisionmaking process. *See Union Pacific R.R. v. United States*, 637 F.2d 764, 767–68 (10th Cir.1981). The court remanded the matter to the ICC to reconsider its rate determination. *Id.* at 768–69.[4]

Following the Tenth Circuit's decision setting aside the ICC's order, Union Pacific brought this action in the United States District Court for the District of Nevada to recover its reparation payments. The district court granted summary judgment for Union Pacific. This appeal followed.[5]

### III

Union Pacific filed its original complaint on October 5, 1981, seeking return of its reparation payments made for overcharges under Tariff 6034. Over four years later, Union Pacific moved to amend its complaint, adding a request for recovery of payments made for Tariff 6020 overcharges. Nevada Power objected to the amended complaint, contending that the additional claim was barred by the statute of limitations. The district court granted Union Pacific's motion, holding that the claim related back to the original complaint and was thus not time-barred. Our review of a district court's rejection of a statute of limitations defense under the relation-back doctrine is plenary. *See Martell v. Trilogy Ltd.*, 872 F.2d 322, 325 (9th Cir.1989).

■ Federal Rule of Civil Procedure 15(c), as it presently reads, provides in pertinent part:

Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

Rule 15(c) is to be interpreted literally. *Miles v. Department of Army*, 881 F.2d 777, 782 (9th Cir.1989). We differentiate between pleadings attempting to amend *claims* from those seeking to amend *parties.* *Martell*, 872 F.2d at 324. Amendments seeking to add claims are to be granted more freely than amendments adding parties. *See id.* "When a suit is filed in a federal court under the [Federal Rules of Civil Procedure], the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement." *Id.* at 326 (quoting *Barthel v. Stamm*, 145 F.2d 487, 491 (9th Cir.1944), *cert. denied*, 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1430 (1945)). Thus, we must determine whether Nevada Power had "fair notice of the transaction, occurrence, or conduct called into question." *Id.* at 327.

■ Under this standard, Union Pacific's reference to only Tariff 6034 in its original complaint does not foreclose its subsequent request for recovery of reparations made under Tariff 6020. Union Pacific's claim under Tariff 6020 arose as a direct result of the facts surrounding its claim under Tariff 6034. When Union Pacific cancelled Tariff 6034 after ordered to do so by the ICC, Tariff 6020 automatically became effective, and Union Pacific began charging rates which later resulted in more reparation payments paid by Union Pacific. Nevada Power had "fair notice" of the disputed transaction. The district court did

---

4. The district court concluded that the Tenth Circuit's decision effectively set aside both the Commission's July 31, 1979 and April 15, 1980 orders. Nevada Power does not appeal this holding.

5. This is an action arising under 49 U.S.C. § 10761; thus, the district court had jurisdiction under 28 U.S.C. § 1337. *See Thurston Motor Lines v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534–

35, 103 S.Ct. 1343, 1343–44, 75 L.Ed.2d 260 (1983). The district court's order granting summary judgment was a final order and, accordingly, we have jurisdiction pursuant to 28 U.S.C. § 1291.

We review a grant of summary judgment de novo. *See Columbia Pictures Indus. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278, 279 (9th Cir.1989).

not err in granting Union Pacific's motion to amend its complaint.

## IV

■ Having concluded that Union Pacific's amended complaint is properly before us, we next consider the focal issue of this appeal: whether Union Pacific is entitled to the $1.6 million it paid to Nevada Power. Union Pacific contends that it is entitled to funds under 49 U.S.C. § 10761(a), which prohibits a shipper from paying, and a carrier from accepting, less than the rate filed with the ICC. To enforce this requirement, carriers may bring civil actions under this section in federal court. *See Sea–Land Service, Inc. v. Murrey & Son's Co.,* 824 F.2d 740, 742 (9th Cir.1987) ("Courts have traditionally construed the Interstate Commerce Act to allow carriers to bring private suits to recover tariff charges."); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 778 F.2d 1365 (9th Cir.1985) (affirming judgment enforcing a tariff provision).

Nevada Power, in contrast, maintains that this case is not simply a matter of applying filed rates. Nevada Power posits four obstacles to recovery by Union Pacific: (1) that so holding would constitute impermissible "revival" of a rate; (2) that Union Pacific can be made whole subsequently if the ICC should reinstate the tariff rates; (3) that the Tenth Circuit's decision setting aside the ICC order did not apply retroactively; and, (4) that the filed rate doctrine does not apply. We consider each in turn.

## A

Initially, Nevada Power contests the authority of this court to grant relief to Union Pacific. Such relief, Nevada Power contends, is tantamount to a revival of rates, a result which the Supreme Court explicitly rejected in *Burlington Northern Inc. v. United States,* 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982).

*Burlington Northern* is the culmination of but one facet of a lengthy dispute between the city of San Antonio and two railroads—Burlington Northern and Southern Pacific—regarding rates for transport-

ing coal from Wyoming to San Antonio's electricity-producing plants. In October 1976, the ICC issued an interim decision (*San Antonio I*) establishing a rate of $10.93 per ton. This decision was affirmed by the Eighth Circuit.

In 1978, the ICC, following petitions for modification from the railroads, issued a new order (*San Antonio II*) establishing maximum rates of $16.12 per ton. Both the city and the railroads sought reconsideration of this order. In June 1979, a new order was issued (*San Antonio III*), resulting in a new maximum rate of $17.23 per ton. The railroads then filed tariffs at this maximum rate.

All parties petitioned for review in the District of Columbia Circuit. In June 1980, the District of Columbia Circuit concluded that both the *San Antonio II* and *San Antonio III* rate orders were "arbitrary and capricious"; the orders were vacated and the case remanded to the Commission. *See San Antonio v. United States,* 631 F.2d 831, 851–53 (D.C.Cir.1980). The parties, unsure of the impact of the Court of Appeals' decision on interim rates, asked the D.C. Circuit for clarification. The appellate court granted the request for clarification and, on June 30, 1981, issued its clarification order. Noting that it was powerless to determine interim policy pending the Commission's determination on remand, the court concluded the effect of its 1980 decision was to reinstate the *San Antonio I* rate order. *San Antonio v. United States,* 655 F.2d 1341, 1344 (D.C.Cir.1981).

The Supreme Court granted certiorari and reversed the D.C. Circuit's clarification order. The Court observed:

> To recapitulate, our cases stand for three propositions: (1) under the Interstate Commerce Act, primary jurisdiction to determine the reasonableness of rates lies with the Commission; (2) federal-court authority to reject Commission rate orders for whatever reason extends to the orders alone, and not to the rates themselves; (3) where there is a dispute about the appropriate rate, the equities favor allowing the carrier's rate to con-

trol pending decision by the Commission, since under the Act, the shipper may receive reparations for overpayment while the carrier can never be made whole after underpayment.

*Burlington Northern,* 459 U.S. at 141–42, 103 S.Ct. at 520–21 (citations omitted). Applying these maxims to the case before it, the Court concluded that "by entering an order declaring that the *San Antonio I* rate order was 'revived' for the period June 1980–May 1981, the Court of Appeals did that which we have said a federal court may not do: *i.e.,* freeze the rate that railroads charge shippers prior to a decision by the Commission as to what a reasonable rate should be." *Id.* at 142, 103 S.Ct. at 521. Rather, "[i]n striking the orders in *San Antonio II* and *III,* the court's action operated to leave in effect the rates filed under the Commission's authority pending the Commission's redetermination of a reasonable rate." *Id.* at 144, 103 S.Ct. at 522.

■ Here, Nevada Power claims that this conclusion mandates reversal of the district court's grant of summary judgment for Union Pacific. The district court, Nevada Power contends, "revived" the rates in Tariff 6020 and 6034. We disagree. In striking the Hiawatha–Moapa rate orders, the Tenth Circuit's action operated to leave in effect the rates filed under the Commission's authority pending the Commission's redetermination of a reasonable rate. The rates filed under the Commission's authority are those found in Tariffs 6034 and 6020.

Should we have had any doubt about this conclusion, we need look no further than *Burlington Northern*'s third maxim for support. "[W]here there is a dispute about the appropriate rate, the equities favor allowing the carrier's rate to control pending decision by the Commission." *Id.* at 141, 103 S.Ct. at 521. This rule is grounded on the provisions of the Act which permit a shipper to recover overpayments if the Commission should decide that a carrier's rates were unreasonable, but prevents a carrier from recovering reparations if the Commission later determines that the prescribed maximum rates were unnecessarily low. *See id.* at 142, 103 S.Ct. at 521.

### B

■ Nevada Power, however, contends that the Court's third maxim should not influence our decision, as "Union Pacific can be made whole if the ICC, on remand, reinstates the Tariff 6034 and 6020 rates." Nevada Power reasons that any "undercharge" in this case resulted from a Commission, not a court order, and thus, the limitation on carrier reparations noted in *Burlington Northern* is absent.[6]

Whatever the merits of Nevada Power's argument might be, it would be unwise for us to consider it at this time. To so hold, we would necessarily speculate as to the rights of Union Pacific *if* the ICC decides in its favor. We, of course, may not render an advisory opinion. *See O'Bremski v. Maass,* 915 F.2d 418, 423 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 986, 112 L.Ed.2d 1070 (1991). Rather, it suffices to note that Union Pacific's ability to recover reparations is debatable. In contrast, Nevada Power's ability to recover reparation payments is unquestioned. Thus, the same equitable concerns motivating the Supreme Court's decision in *Burlington Northern* are also present here.

### C

Nevada Power contends that the rule announced in *Burlington Northern* was not to be applied retroactively. Nevada Power notes that *Burlington Northern* and *Southern Pacific*[7] *involved the appro-*

---

6. To restate, a carrier may receive reparations only when underpayment was the result of the Commission's suspension of a tariff; when a *court* prevents a carrier from collecting a higher tariff, subsequent reparations are not permitted. *Burlington Northern,* 459 U.S. at 142 n. 6, 103 S.Ct. at 521 n. 6.

7. *Southern Pacific Transportation Company v. San Antonio,* 748 F.2d 266 (5th Cir.1984), is, as the name suggests, yet another opinion in the ongoing dispute between the city of San Antonio and the railroads regarding coal shipment rates. There, the United States District Court for the Western District of Texas granted summary judgment for the railroads and awarded them

*priate rate for shipments made after* an appellate court had vacated an ICC order, whereas the question here is the appropriate rate preceding both the Tenth Circuit opinion and the ICC order disapproving the filed rates. An appellate court's vacation of an ICC order, Nevada Power argues, should not be retroactive.

It is true that the present case differs from *Burlington Northern* and *Southern Pacific* in the manner described by Nevada Power. We are, however, at a loss to see the relevance of this distinction. The same equities that prompted the Court's holding in *Burlington Northern* compel the same result here; since Union Pacific's ability to recover undercharges caused by court action is, at best, disputed, while Nevada Power's ability to recover overpayments is unquestioned, the carrier's rate should control pending a Commission determination to the contrary.

### D

Nevada Power contends that the equities in this case do not support a rigid application of the filed rate doctrine in this case. However, the "equitable exception" to the filed rate doctrine was rejected by the Supreme Court in *Maislin*. *See* 110 S.Ct. at 2769 ("strict adherence to the filed rate has never been justified on the ground that the carrier is equitably entitled to that rate, but rather that such adherence, despite its harsh consequences in some cases, is necessary for enforcement of the Act").

The district court correctly concluded that Union Pacific was entitled to its filed tariff rates pending a final rate determination by the Interstate Commerce Commission.

### V

Finally, Nevada Power contends that summary judgment was inappropriate because material issues of fact remain.

approximately $19.8 million in damages for freight charges withheld by San Antonio. The district court, however, stayed the judgment pending final resolution of the ICC's rate proceedings. The Fifth Circuit granted the rail-

### A

First, Nevada Power argues that there is a dispute of fact regarding shipments occurring during a particular two-week period. However, Nevada Power has neither stated the nature of this dispute nor identified the two-week period at issue, either before this court or the district court. "To overcome summary judgement the non-moving party 'must establish that there is a genuine issue of material fact' and demonstrate more than some metaphysical doubt as to the material facts.'" *City of Long Beach v. Standard Oil Co. of California*, 872 F.2d 1401, 1403–04 (9th Cir.) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)), *amended on other grounds*, 886 F.2d 246 (1989), *cert. denied*, 493 U.S. 1076, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990). Nevada Power has not sustained its burden here.

### B

Nevada Power also contends that its settlement agreement with Utah Railway forecloses summary judgment, as there remains a dispute as to the division of rates among the two carriers. Again we disagree. As with the first purported issue of material fact, Nevada Power failed to provide either this court or the district court with any information from which a meaningful decision could be made. While we appreciate that certain railroad contracts must remain confidential, *see* 49 U.S.C. § 10713(b), Nevada Power has failed to provide such information as is required to be made public. Indeed, we cannot tell if the settlement agreement even addresses rates for the period at issue. Thus, Nevada Power has again failed to meet its burden at the summary judgment stage.

In addition, we note that summary judgment is appropriate when there is no genuine issue of *material* fact. *See Anderson*

road's petition for mandamus, concluding that the stay "would undermine the Supreme Court's holding in *Burlington Northern* and conflict with the traditional 'filed rate' doctrine." *Id.* at 271.

*v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Which facts are material is governed by relevant substantive law. *Id.* Here, Nevada Power's obligation is to pay the filed tariff rate. *See Southern Pacific,* 748 F.2d at 274. Whether the tariff rate is joint or individual is irrelevant. In *Louisville & Nashville Railroad v. Sloss–Sheffield Steel & Iron Company,* 269 U.S. 217, 46 S.Ct. 73, 70 L.Ed. 242 (1925), the Supreme Court held: "The division of the joint rate among the participating carriers is a matter which in no way concerns the shipper. The shipper's only interest is that the joint rate be reasonable as a whole." *Id.* at 234, 46 S.Ct. at 79. *Sloss–Sheffield* is distinguishable—there, the Court held one of several carriers was jointly and severally liable for an excessive joint rate, whereas here the question is one of a shipper's liability to one of two joint carriers. However, the principle is the same: a shipper is to avoid disputes over the division of rates among joint carriers. If Nevada Power feared exposure to multiple liability, its remedy was to obtain interpleader by way of cross-claim or counterclaim. *See* Fed.R.Civ.P. 22(1).

We find no issue of material fact precluding the grant of summary judgment for Union Pacific.

### VI

For the foregoing reasons, we conclude that the district court did not err in granting summary judgment for Union Pacific.

AFFIRMED.

DAVID R. THOMPSON, Circuit Judge, dissenting:

I respectfully dissent.

"[F]ederal-court authority to reject Commission rate orders for whatever reason extends to the orders alone, and not to the rates themselves...." *Burlington Northern, Inc. v. United States,* 459 U.S. 131, 141, 103 S.Ct. 514, 521, 74 L.Ed.2d 311 (1983). Accordingly, when the Tenth Circuit set aside the ICC "decision" and remanded the case to the ICC for further proceedings "to render a decision which will more fully explain and justify the action taken, whatever it may be," *Union Pacific R.R. v. United States,* 637 F.2d 764, 768 (10th Cir.1981), the ICC maximum rate of $7.91 per ton was unaffected.

The linchpin of Union Pacific's claim against Nevada Power for the alleged underpayments must be that the $7.91 maximum rate set by the ICC went away when the Tenth Circuit set aside the ICC decision, or that the Tenth Circuit decision enabled the Union Pacific filed rates to trump the ICC $7.91 maximum reasonable rate. The Supreme Court tells us in *Burlington Northern* that the courts (in this case the Tenth Circuit) cannot do away with ICC rates. The $7.91 maximum rate set by the ICC, therefore, remained effective notwithstanding the Tenth Circuit decision, and I am unpersuaded that the carrier can ignore this maximum rate by relying upon rates it has filed, and which prompted the ICC to set the maximum reasonable rate. *See Maislin Industries v. Primary Steel,* —— U.S. ——, 110 S.Ct. 2759, 2767, 111 L.Ed.2d 94 (1990) ("filed rate is not enforceable if the ICC finds the rate to be unreasonable").

The ICC in due course will determine what debits and credits are appropriate between the parties to this litigation. Pending that determination, we should not interfere in the work of the ICC under the guise of the third *Burlington Northern* proposition that "where there is a dispute about the appropriate rate, the equities favor allowing the carrier's rate to control pending decision by the Commission, since under the Act, the shipper may receive reparations for overpayment while the carrier can never be made whole for underpayment." *Burlington Northern,* 459 U.S. at 141–42, 103 S.Ct. at 520–51. Here, the Commission *has* set a maximum reasonable rate, albeit a rate which is subject to reconsideration in light of the Tenth Circuit's decision in *Union Pacific,* 637 F.2d at 768. Moreover, I think it is inappropriate for this court to apply *Burlington Northern's* third proposition when to do so requires us to violate *Burlington Northern's* second

proposition. *See Burlington Northern,* 459 U.S. at 141–42, 103 S.Ct. at 520–21.

I would reverse the district court's order granting summary judgment and would remand this case to the district court with instructions to stay proceedings in that court pending resolution of the parties' dispute now pending before the ICC.